**CLEVELAND v. UNITED STATES and ten other cases.**

Nos. 2945–2955.

Circuit Court of Appeals, Tenth Circuit.

Jan. 4, 1945.

Writ of Certiorari Granted March 12, 1945.

See 65 S.Ct. 858.

Claude T. Barnes and Edwin D. Hatch, both of Salt Lake City, Utah (J. H. Mc-Knight and Knox Patterson, both of Salt Lake City, Utah, on the brief), for appellants.

John S. Boyden, Asst. U. S. Atty., of Salt Lake City, Utah (Dan B. Shields, U. S. Atty., and Scott M. Matheson, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Six indictments were returned in the United States Court for Utah, five drawn under section 2 of the Mann Act, 18 U.S. C.A. § 398, and one drawn under section 3 of the Kidnapping Act, as amended, 18 U.S. C.A. § 408a. The indictment in one case drawn under the Mann Act charged that Heber Kimball Cleveland transported a certain woman, not then his wife, in interstate commerce from Salt Lake City, Utah, to Evanston, Wyoming, for the purpose of debauchery, and for the further immoral purpose of having sexual intercourse with her. The other indictments drawn under the Mann Act contained like charges, varying only in name of the accused, name of the woman transported, date, and points of origin and termination respectively of the transportation. The indictment drawn under the Kidnapping Act charged that the defendants transported, caused to be transported, and aided and abetted in transporting a certain girl in interstate commerce from Provo, Utah, by way of El Paso, Texas, to Short Creek, Arizona, well knowing her to have been inveigled, decoyed, carried away, and held. After trial by jury had been waived, the cases were submitted to the court on stipulated facts. The court found the defendant or defendants in each case guilty as charged in the indictment; and from the sentences imposed, separate appeals were perfected but the cases were briefed and argued together.

A detailed statement of the particular facts in each case would not serve any useful purpose. In most of the cases involving

the charge of violating the Mann Act, the defendant was married; while married to his lawful wife, he and the woman named in the indictment went through a ceremony known in the religious cult of Fundamentalists as a plural or celestial marriage; after the ceremony they went into another state for the purpose of living and cohabiting together; and they did live and cohabit together there. In one case, the defendant, while married to his lawful wife, and the girl named in the indictment went from Utah to California for the purpose of being married by a celestial ceremony and then living together as man and wife. After the ceremony, they spent the night together and engaged in sexual intercourse, but the following day she refused to go further with their marriage. And in one case, one of the defendants was living in a state of plural marriage with the woman named in the indictment; and at their request, the other defendant, also a member of the Fundamentalist cult, transported the woman in interstate commerce in order that the cohabitation in plural marriage might continue. In some instances, the celestial ceremony was performed by a member of the Priesthood Council of the cult. In others, the record fails to indicate the position or title of the person performing it. In the case involving the charge of violating the Kidnapping Act, a girl fourteen years old but having the mental capacity of a child about seven years of age was employed by one of the defendants as a housekeeper. They went through a celestial ceremony, and she later became pregnant. Discovering her condition, her parents informed the juvenile authorities; and she was placed in the custody of the Welfare Department of the state, subject to the continuing jurisdiction of the court. With some aid, she escaped and went to the home of the other two defendants. There the three defendants persuaded and convinced her that she should abide "by the law of God rather than the law of man"; that she was justified in running away from the Juvenile Court; that she should go with them to Mexico to be legally married to the defendant in whose home she had been employed; and that she should then remain in hiding until she reached her majority. After thus persuading and convincing the girl, all three defendants transported her from Salt Lake City to Juarez, Mexico, where a civil marriage ceremony was performed. They then transported her to a point in Utah. There the defendant who had assumed to marry her in the manner outlined obtained transportation from another member of the cult, and she was taken to Short Creek, Arizona, where she remained in hiding for more than two years, until discovered by federal authorities. While in hiding, she and the defendant last referred to continued to live together as man and wife.

█ It is contended that the court erred in denying the motion to quash the indictment in each case. The ground relied upon in each instance was that the grand jury which returned the indictment, and each member thereof, was prejudiced against the defendant and was therefore disqualified to sit as a grand juror in the matter; and that the return of the indictment by grand jurors of that kind constituted a wrongful invasion of the rights of the defendant. An affidavit of the defendant was attached to the motion, in which it was stated that he was an earnest and profound believer in the doctrines and principles of the Church of Jesus Christ of Latter-Day Saints, commonly referred to as the Mormon Church; that he believed in, taught, and practiced the doctrine of plural marriages; that about the year 1920 a breach arose in the church with reference to the practice of polygamy, resulting in factional disagreement and intense bitterness; that due to such bitterness, the dominating high priesthood of the church aided, assisted, and incited the convening of the grand jury and the return of the indictment; that the foreman of the grand jury was a prominent and dominating figure in the high priesthood quorums of the church; that, upon information and belief, a large majority of the grand jurors, if not all of them, were likewise influential members of the church; and that the indictment was returned in a spirit of animosity and enmity toward the defendant. There is no need to explore the question of law whether in a United States court an indictment regular on its face may be attacked by motion to quash on the ground that some or all members of the grand jury which returned it were prejudiced against the accused. Except the ex parte affidavit attached to the motion, which contained many allegations predicated upon information and belief, there was no showing that the foreman or any other member of the grand jury belonged to any particular religious sect, or that he bore any animosity,

enmity, or prejudice against the defendant. Neither was there any showing that due to prejudice or other like attitude toward the defendant, the foreman or any other member exerted or sought to exert influence with members of the body in bringing about the return of the indictment. Assuming, without so deciding, that the indictments were subject to attack on the ground indicated, the motions and ex parte affidavits, alone and without more, were not enough to warrant the quashing of them.

■ The judgments in the cases charging the violation of the Mann Act are challenged for lack of jurisdiction of the court. The argument is that it is the function of the states to regulate marriage and divorce within their respective borders; and that a United States court has no jurisdiction in cases of this kind to forbid, regulate, or declare upon the form, type, or number of marriages permissible in the state, or to declare that a polygamous marriage is bad in itself, or that it is a form of prostitution or debauchery. It does lies within the exclusive jurisdiction of the states to regulate and control marriage and divorce within their respective borders. And plural marriages are forbidden by the law of the state where these celestial ceremonies occurred, and by the law of the states into which the women and girls named in the indictments were transported. But the Mann Act, supra, does not undertake to declare what marriages shall be legal and what illegal. It does not concern itself with that question. Instead, it is addressed to the matter of interstate commerce. Section 2 provides that it shall be unlawful to transport or aid in the transportation in commerce of any woman or girl for the purpose of prostitution, debauchery, or any other immoral purpose. Article 1, section 8, of the Constitution of the United States empowers Congress to regulate commerce among the states. That grant of power is direct, plenary, and without limitation except as limited by the Constitution itself. And within the permissible range of exertion of the power lies authority to enact all appropriate legislation for the protection and advancement of commerce. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Congress is free in the exercise of its discretion in respect to means of protecting and advancing commerce to adopt any means which appear to it as appropriate and adapted to the end in view, provided it is consistent with the letter and spirit of the Constitution. Everard's Breweries v. Day, 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174. And it is no basis for valid objection that the means adopted have the same quality and are attended by the same incidents which attend the police power of the states. United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234.

■■ Commerce among the states consists of intercourse and traffic among its citizens. It includes the transportation of persons as well as property. While the states alone can penalize the practice of prostitution, debauchery, or other immoral conduct within their respective borders, Congress has power under the constitutional provision, supra, to forbid such practices and conduct through the channels of interstate commerce. And it is within the constitutional range of the power of Congress to prohibit under penalty prostitutes, or persons who engage in debauchery or other immoral practices, being transported in commerce in furtherance of their immoral conduct. Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.,N.S., 906, Ann.Cas.1913E, 905; Athanasaw v. United States, 227 U.S. 326, 33 S.Ct. 285, 57 L.Ed. 528, Ann.Cas. 1913E, 911; Wilson v. United States, 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728.

■ The Mann Act, supra, is not limited to the transportation in interstate commerce of women and girls for the purpose of prostitution or debauchery. By express provision, it includes their transportation for any other immoral purpose. The primary objective in the enactment of the statute was to eliminate the "white slave" business which employs interstate commerce as a means of procuring and distributing its victims. But it is settled law that the transportation in commerce of a woman or girl for the purpose of her becoming the mistress or concubine of the accused comes within the Act. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168. And we think that the transportation in commerce of a woman or girl to whom the accused is not legally married, though they did go through a so-called celestial plural marriage ceremony which was forbidden by the law of the state where it took place, or intend to go through

734

such ceremony, with the intent and purpose of living and cohabiting with her, constitutes in law transportation for the purpose of her becoming his mistress and therefore contravenes the Act. Cf. Caminetti v. United States, supra.

The case of Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, is not to the contrary. There the accused husband and wife were engaged in the operation of a house of prostitution. They planned an automobile trip to visit the parents of the wife. Two girls employed by them as prostitutes requested to be taken along for a vacation. The four made the interstate trip by motor. After their return, the girls resumed their immoral conduct. It was held that the trip must be treated in its entirety as one of recreation and holiday; that it could not be arbitrarily split into separate parts and viewed differently; and that since no immoral purpose was contemplated, the statute did not apply. Manifestly, no comparable situation is presented here.

■ The judgments are attacked on the further ground that they interfere with the freedom of religion. It is argued that the defendants below believe the Divinity and Doctrines of Joseph Smith as published by the early Mormon Church; that they accept those doctrines as their religious guide; and that such doctrines approve plural marriages. The First Amendment to the Constitution provides in effect that Congress shall not enact any law which interferes with the free exercise of religion. But the interdiction relates to legislation in respect to religious belief. It does not withhold power to enact legislation forbidding practices arising out of religious opinion. The right to engage in a practice which violates a forbidding Act of Congress valid in other respects cannot be asserted with success merely because the practice arises out of religious conviction. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244. The transportation in commerce of a woman to whom the accused is not married, although they did go through a celestial ceremony of plural marriage forbidden by the law of the state, or intend to go through such ceremony, for the purpose of living and cohabiting with her as man and wife, is a practice which Congress has the constitutional power in its protection of commerce to penalize. Caminetti v. United States, supra.

■ The next contention is that there was no intent to transport the women and girls named in the indictments across state lines for the purpose of prostitution or debauchery. Except in the case of certain statutory offenses, a criminal intent is generally an element of crime; but every person is presumed to intend the necessary and legitimate consequences of that which he does, and it is no defense to a penal act, knowingly and intentionally committed, that it was done with an innocent intent. Gates v. United States, 10 Cir., 122 F.2d 571, certiorari denied, 314 U.S. 698, 62 S. Ct. 478, 86 L.Ed. 558.

■ The judgments in the case charging a violation of the Kidnapping Act, supra, are assailed on the ground that the Act is inapplicable to a case of this kind. The Act is not confined to the transportation in interstate commerce of a person who has been kidnapped by physical force and is being unlawfully restrained in order that his captor might secure for himself payment of a pecuniary consideration or something else of material value. Gooch v. United States, 297 U.S. 124, 56 S. Ct. 395, 80 L.Ed. 522. In presently material respect, it makes it unlawful knowingly to transport or cause to be transported, or aid or abet in transporting, in commerce any person who shall have been unlawfully inveigled, decoyed, or carried away for ransom or reward or otherwise. Here, the girl named in the indictment was fourteen years old, but she had the mentality of a child only seven years of age. After one of the defendants and the girl had gone through a celestial ceremony while she was employed as a domestic in his household, after she had become pregnant by him, after she had been placed in the custody of state authorities but subject to the continuing jurisdiction of the court, after she had escaped, and after she had gone to the home of the other two defendants, the three defendants transported her in commerce in order that she might remain in hiding from the court and the Welfare Department and continue to live and cohabit with the defendant in whose home she had been employed. We think it requires no amplification or elucidation to make plain that these acts and the inferences fairly to be drawn from them, considered in their totality, constituted the transportation in commerce of a person who had been inveigled, decoyed, and car-

ried away in order that one of the defendants might secure a benefit to himself, within the meaning of the Act.

It remains to inquire whether any right of the defendants in respect to the filing of motions for new trial was infringed. Rule 1 of the Rules of Practice and Procedure after plea of guilty, verdict or finding of guilt, in Criminal Cases, 292 U.S. 661, 18 U.S.C.A. following section 688, provides among other things that after a finding of guilt by the trial court where a jury has been waived sentence shall be imposed without delay, unless a motion for a new trial is pending; and Rule 2 provides that motions for a new trial shall be made within three days after the finding of guilt, except that such motions based solely upon the ground of newly-discovered evidence may be made within sixty days after final judgment. After these cases were submitted, the trial court took them under advisement. Thereafter the court filed a written opinion in which the several defendants were adjudged to be guilty of the charges laid in the indictments. The opinion directed that a journal entry be entered to that effect, and that the defendants might remain at liberty on their respective bonds, subject to such order as might be made for their appearance for final judgment. Something more than two weeks later the cases were taken up again, the defendants being present. The court entered formal verdicts of guilty, and then indicated its purpose to impose sentence and enter final judgment. The attorneys for the defendants expressed a desire to file motions for new trial. In the course of discussion between the court and the attorneys, the court announced:

"My point is I am here ready to sentence now. If you want to file your motion for a new trial—it says you must file them promptly—you have had two weeks. If you want to do that now you may do it and I will dispose of them at once and then sentence. If you want to defer that, I will sentence now and you can file your motion afterwards. You can use your own judgment in respect to it."

After further discussion, the court recessed until afternoon, and then imposed the sentences. But no motions were filed, then or later. It is clear that there was no infringement upon the right of the defendants to file their motions at any time during the period fixed by the rule.

The judgments are severally affirmed.