MITCHELL, Secretary of Labor

v.

PILGRIM HOLINESS CHURCH
CORP.

No. 10909.

United States Court of Appeals,
Seventh Circuit.

Feb. 23, 1954.

**880**

Stuart Rothman, Sol., Bessie Margolin, Chief of Appellate Litigation, and Joseph M. Stone, Atty., U. S. Dept. of Labor, Washington, D. C., Herman Grant, Reg. Atty., Chicago, Ill., for appellant.

Carl Seet, Seet & Rigot, Indianapolis, Ind., for defendant-appellee.

Before MAJOR, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This appeal presents a question of whether or not the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., is applicable to the employees of the defendant, The Pilgrim Holiness Church Corporation, a religious corporation organized under the laws of the State of Indiana. This corporation owns and occupies the major portion of a five and a half story building located in the downtown section of Indianapolis, Indiana. The defendant has a printing plant in the basement of this building, a mail order office, a book store and the office of its general treasurer on the first floor, and the general offices of other departments of the corporation on the second and third floors. It rents the fourth and fifth floors as general office space to tenants who have no other connection with the defendant corporation.

The Secretary of Labor of the United States filed an action against the defendant alleging violation by the defendant of Sections 6, 7, 11 and 15 of the Fair Labor Standards Act, in that the defendant had paid its employees less than the minimum wage rate required by the Act; that the defendant had failed to pay its employees the overtime prescribed by the Act for work in excess of forty hours per week; that defendant had failed to make, keep and preserve adequate and accurate records as to the hours worked by its employees and the wages paid therefor; and that defendant had sold and shipped in interstate commerce goods in the production of which its employees had been employed in violation of Sections 6 and 7 of the Act. The complaint asked for a judgment permanently enjoining the defendant from further violating the Act.

The defendant filed a motion to dismiss the complaint because it did not state a claim on which relief could be granted. The plaintiff thereupon filed a motion for summary judgment on the ground that there was no genuine issue as to any material fact and that plaintiff was entitled to judgment as a matter of law. The plaintiff's motion was supported by the affidavit of an investigator for the Department of Labor who made an investigation of the defendant's records, books and invoices, and as to the activities, wages and hours worked by the defendant's employees. This affidavit stated that the investigator had visited and inspected the defendant's building and had talked with the officers and employees of the defendant corporation, and that the affidavit was made on the basis of information the investigator had obtained in such investigation and interviews.

The investigator's affidavit disclosed the following facts. The defendant, as a part of its activities, operates a printing establishment which prints pamphlets, leaflets, magazines and other printed material most of which is of a religious nature and most of which is delivered by mail to customers outside of the State of Indiana. In the two year period from September 1950 to September 1952, the defendant's mail order department made sales to customers in Indiana in the amount of $147,606.55, while the sales to customers outside of Indiana totaled $222,519.67. During this same two year period the printing department of the church corporation did work having a total dollar value of $118,602.93. Of this last amount $13,861.46 represented printing work done by the defendant.

for commercial firms, individuals and other printing shops. This latter work included letter-heads, insurance policy blanks and riders, calendar calling cards, post cards, greeting cards, stationery and job printing of other types.

From the general treasurer of the defendant the investigator learned that in 1949, $125,000.00 of the assets of the defendant represented profits from its printing and publishing activities; that, as of July 1952, the corporation's assets represented a total of $247,516.88, an increase of $65,000.00, and that their publication service was "reaching more and more beyond our own denomination, for church and Sunday school supplies." The defendant employs 39 persons exclusive of church officials and employees who work in the defendant's retail book store. Thirteen of these employees physically produce the printed matter in the printing plant, including wrapping, addressing and shipping, while the others do the editorial and clerical work, act as receiving and shipping clerk, operate the elevator and do the janitor work.

The payroll and time records of the defendant and interviews with its employees and representatives disclosed the violations of the Fair Labor Standards Act alleged in the complaint.

A counter-affidavit made by the general treasurer of the defendant corporation stated that the defendant is incorporated as a religious organization under the laws of the State of Indiana; that the purpose for which it was organized was "to glorify God, publish the full Gospel to every nation, and promote the Christian religion by spreading religious knowledge, and generally to function as a Church body, and particularly as the head of the Pilgrim Holiness Churches"; that its printing department is for the primary purpose of supplying its various other departments with the necessary literature and printed matter and that the defendant "has not knowingly or intentionally engaged in ordinary commercial printing and has done no such work except in a few isolated instances of an insignificant amount."

In opposition to the plaintiff's motion for summary judgment the defendant also filed affidavits made by several of its employees indicating that they did not consider themselves as "mere wage earners," but rather that they had accepted work with the defendant in the belief that they were doing religious work.

The District Court denied the plaintiff's motion for summary judgment, treated the defendant's motion to dismiss the complaint as a motion for summary judgment to be disposed of as provided for in Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., and entered judgment dismissing the action.

■■■ In considering the propriety of the entry of this summary judgment on the motion of the defendant we must remember that all facts properly pleaded by the plaintiff must be accepted as true, Purity Cheese Co. v. Frank Ryser Co., 7 Cir., 153 F.2d 88; and that the facts disclosed by the affidavits and counter-affidavits must be considered in the light most favorable to the plaintiff, Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881, 884; and that, "A summary judgment upon motion therefor by a defendant * * * should never be entered except where the defendant is entitled to its allowance beyond all doubt." Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213, 216.

The plaintiff insists that the defendant's employees engaged in the operation of its printing plant are entitled to the benefits provided by the Fair Labor Standards Act because they are engaged in the preparation, printing and interstate shipment of printed materials and are, therefore, engaged in interstate commerce or in the production of goods for commerce.

■ We think this contention is sound. The word "commerce" as used in the Fair Labor Standards Act is not limited to transactions where there are actual commercial sales of the goods produced and transported. In Powell v.

United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017, the cartridge company was operating a munitions factory for the Government under a contract providing that for its services the cartridge company would be reimbursed for its .expenditures and in addition thereto be paid a fixed fee for its services. The Government owned the plant used for the manufacture of the ammunition, the raw materials used, the ammunition in the process of being manufactured, and the finished product. The court there held that the "transportation" of this ammunition across state lines to the point where it was to be delivered for use constituted "commerce" within the meaning of the Fair Labor Standards Act, which defined commerce as follows:

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." 29 U.S.C.A. § 203(b).

In Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, the Supreme Court held that the Associated Press, in assembling, receiving and transmitting news items, was engaged in "commerce" and that its employees were, therefore, subject to the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

■ Nor does the amount of goods sent outside the state where it is produced have to be large in order to subject the producer to the provisions of the Fair Labor Standards Act. In Mabee v. White Plains Publishing .Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607, a company publishing a newspaper with a daily circulation of approximately 10,-000, only one-half of one per cent of which newspapers were sent outside of the state, was held to be subject to the provisions of the Fair Labor Standards Act. The court said, 327 U.S. at page 181, 66 S.Ct. at page 512: "Here, Congress had made no distinction on the basis of volume of business. By § 15(a) (1), 29 U.S.C.A. § 215(a) (1), it has made unlawful the shipment in commerce of 'any goods in the production of which any employee was employed in violation of' the overtime and minimum wage requirements of the Act."

In Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, the Fair Labor Standards Act was held to be applicable to the maintenance employees of the owners of a building which was occupied by tenants who were engaged in interstate commerce, on the theory that the maintenance employees of the building were also subject to the Act under Section 3(j), 29 U.S.C.A. § 203(j), which provided that: "for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed * * * in any process or occupation necessary to the production thereof, in any State."

■ But the defendant insists that it is organized for and is engaged in the exercise of religion and that religion is not commerce. If we grant that religion itself is not commerce, it still does not follow that a corporation organized for religious purposes may not engage in "commerce" as defined in the Fair Labor Standards Act, that is, by engaging in "trade, commerce, transportation, transmission, or communication among the several States". By engaging in the printing business, as this defendant did, we think it was clearly engaged in "commerce" within the meaning of the Act.

The defendant admits that the Fair Labor Standards Act does not expressly exempt religious organizations and says that it does not rely upon an implied exemption in the Act. But the defendant insists that if the Act be construed to apply to it, a church corporation engaged in religious work, the Act would prohibit the free exercise of religion and would, therefore, violate the First Amendment of the Constitution of the United States. To sustain this contention the defendant relies principally on the following

decisions of the Supreme Court: Jamison v. State of Texas, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869; Murdock v. Com. of Pennsylvania, 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292; Martin v. City of Struthers, 319 U.S. 141, 149, 63 S.Ct. 862, 87 L.Ed. 1313; Follett v. Town of McCormick, 321 U.S. 573, 576, 64 S.Ct. 717, 88 L.Ed. 938; and Tucker v. State of Texas, 326 U.S. 517, 520, 66 S.Ct. 274, 90 L.Ed. 274.

In the Jamison case, supra, the court held that a city, under its power to make reasonable regulations for the control of traffic and the maintenance of order, may not *prohibit* the dissemination of information by handbills and said that: "The right to distribute handbills concerning religious subjects on the streets *may not be prohibited at all times, at all places, and under all circumstances.*" [318 U.S. 413, 63 S.Ct. 672.] (Our emphasis.)

In the Murdock case, 319 U.S. 105, 112, 63 S.Ct. 870, the Supreme Court considered a flat license tax levied by a city ordinance on the privilege of soliciting people to purchase religious books and pamphlets by members of Jehovah's Witnesses as a tax laid specifically on the privilege of the free exercise of religion, and held that it was, therefore, invalid. But the court there pointed out, 319 U.S. at page 112, 63 S.Ct. at page 874, that it did "not mean to say that religious groups and the press are free from all financial burdens of government."

In Martin v. City of Struthers, 319 U.S. 141, 149, 63 S.Ct. 862, 866, a city ordinance was held invalid which prohibited persons distributing handbills from door to door from summoning the householder to the door to receive the handbills. The court said the ordinance was "invalid because in conflict with the freedom of speech and press." The court indicated that, while the home owner might properly say that he did not wish to be disturbed, the city could not, by such an ordinance, deprive the home owner of the right to decide whether he did or did not want to be disturbed.

In Follett v. Town of McCormick, 321 U.S. 573, 576, 64 S.Ct. 717, 88 L.Ed. 938, the court again held that an ordained minister of Jehovah's Witnesses, going from house to house selling and distributing books and pamphlets, was not required to pay a flat tax prescribed by a city ordinance for the privilege of thus practicing his religion.

In Tucker v. State of Texas, 326 U.S. 517, 66 S.Ct. 274, 90 L.Ed. 274, an ordained minister of Jehovah's Witnesses went into a village which was owned by the United States as a housing project but which, from all indications, was freely accessible and open to the public the same as any typical American town. A manager of the town, who had been appointed by the Federal Housing Authority, ordered the minister to discontinue all religious activity in the village, and when the minister refused, the manager ordered him to leave the village. On the minister's refusal to leave the village, he was arrested. The manager testified that there was a Public Housing Authority regulation which provided that no peddlers or hawkers could come into or remain in the village without obtaining permission from the manager. The Supreme Court held that the facts in this case showed that the defendant was *forbidden* to exercise his religion and that neither Congress nor the Public Housing Authority had the power to do this.

We think that all of the above cases on which the defendant relies are distinguishable from the instant case. The Fair Labor Standards Act does not in this case *prohibit* the free exercise of religion by the defendant nor does it *lay a flat tax* on the privilege.

Under the power to regulate commerce among the several States Congress enacted the Fair Labor Standards Act. As a basis for the Act Congress found, 29 U.S.C.A. § 202:

"(a) The Congress finds that the existence, in industries engaged in

commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is declared to be the policy of sections 201–219 of this title, through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

■ Here we have a remedial measure seeking to insure to the workers of the United States engaged in the production of goods for commerce a minimum wage sufficient to maintain a minimum standard of living which Congress deemed to be necessary to their well-being. We can find no reason for holding that the employees of a church corporation, who work in a printing establishment owned and operated by the corporation, should not be entitled to the benefits of this remedial legislation. While some of the defendant's employees made affidavits stating that they considered their work to be "more than a job," and that in their positions they felt that they were helping in the work of the Lord, we must assume that the wages they received constituted the income on which they lived. It is not suggested that these employees could maintain a minimum standard of living any more cheaply than the employees of any other printing establishment in the City of Indianapolis. Nor is there any intimation that the minimum standard of living as fixed by the Act is not just as necessary to the health and well-being of the defendant's employees as it is to the health and well-being of the employees of any other printing establishment.

■ While the First Amendment to the Constitution does guarantee the free exercise of religion, the right so guaranteed is not without limitations. The individual has the absolute power to believe in any religious doctrine he may choose but only limited power to act pursuant to that belief. As said in Gara v. United States, 6 Cir., 178 F.2d 38, 40: "The guaranty of freedom of religion in the Bill of Rights is not a guaranty of immunity for violation of law." The defendant there was found guilty of violating the Selective Service Act, 50 U.S. C.A.Appendix § 451 et seq. although he believed that it was his Christian duty to act as he did. In Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244, a conviction for bigamy was affirmed although the defendant insisted that under his religion it was his duty to marry the second wife. Again, in Cleveland v. United States, 10 Cir., 146 F.2d 730, the defendant was found guilty of violating the Mann Act although the defendant and the woman involved had participated in a ceremony known and recognized in his religion as a "celestial" or plural marriage. The court there said, 146 F. 2d at page 734: "The right to engage in a practice which violates a forbidding Act of Congress valid in other respects cannot be asserted with success merely because the practice arises out of religious conviction." This judgment was reversed on other grounds, 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198.

In Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 a state law made it unlawful (1) for children to sell newspapers, magazines or other articles on the street, (2) for anyone to furnish children articles for such sale, and (3) for any

parent or custodian of a child to permit the child to sell articles on the street. Mrs. Prince and her nine year old niece, of whom she had custody, were both members of Jehovah's Witnesses and were both "ordained ministers" of that faith which taught that it was the religious duty of its adherents to perform such work. Mrs. Prince was found guilty by the state court of violating this law and the Supreme Court affirmed the judgment. The Supreme Court there again pointed out that the rights of religion are not beyond limitations and that it is in the interest of the whole community and of society to safeguard children from abuses and to give them opportunity for growth into free, independent and well developed citizens.

In the recent case of Poulos v. New Hampshire, 345 U.S. 395, 405, 73 S.Ct. 760, 97 L.Ed. 1105, the Supreme Court reiterated its adherence to the principle that the guarantees of the First Amendment of freedom of speech and of the exercise of religion are not violated by reasonable, nondiscriminatory regulation by governmental authority that preserves peace, order and tranquility.

It seems clear, in the instant case, that the Fair Labor Standards Act is such a reasonable, nondiscriminatory regulation by an Act of Congress, a regulation in the interests of society for the welfare of all workers, and that, therefore, the application of the provisions of the Act to the Pilgrim Holiness Church Corporation and to its employees who work in the production, printing, handling, addressing and distributing of the books, magazines, pamphlets, leaflets and other printed matter issued by the defendant and to all other employees of the defendant whose work is necessary to the production of such goods does not violate the Constitutional provisions guaranteeing the free exercise of religion.

The judgment of the District Court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.